Good morning. Good morning. May it please the court. Excuse me. I'm Spencer Freeman. I represent the appellant William Hunt in this matter like to reserve 5 minutes for rebuttal. I want to start by addressing why appellant's briefing focuses on the definition of duty and the source of the duty that we allege is owed by Medtronic without defining the duty and the source of duty. It cannot be properly determined. What evidence is required to establish a breach of that duty. The trial court in this case did not properly define the duty nor the source of duty. Medtronic does not suggest that duty or what the source of duty is and we're here to ask you to define that duty. The duty owed by Medtronic as alleged in the complaint is not a specialized duty but rather the common law duty of ordinary care. The care of a reasonably careful person would exercise under the same or similar circumstances. Now, there's specialized technology here, and it's really easy to get distracted by the fact that there's specialized technology. But that specialized technology is the context that technology is developed, sold by Medtronic, and then implanted in the person. And once it's implanted, Medtronic represents that it will take care of technical issues should they arise. And by the way, Medtronic is the sole entity that can take care of any technical issues should they arise. Let's talk about one thing first and clear it out of the way. Your contract claim was dismissed for lack of adequate allegations. The promises – that's not on appeal, right? So the contract – the promises that I just mentioned, the affirmations from Medtronic telling a patient that they will provide technical services. Contract claim is not on appeal. It is not on appeal. That's a separate thing. No, the contract claim – and the reason the contract claim is not on appeal is that device is actually sold to the doctor, to the pain clinic. It's not sold directly to a plaintiff. And so Medtronic can – and successfully asserted there is no actual contract between Medtronic and the plaintiff. And that actually emphasizes why it's even more important that we look at the duty that is established between Medtronic and a prospective plaintiff as one is based off the relationship. And the state of Washington has long recognized that duties can exist between parties based off of a special relationship, and that exists here. I mean you can look at Ferndale versus – sorry, Myers versus Ferndale, prime example finding that relationships can establish duties amongst people. Folsom versus Burger King, same thing. The relationship amongst parties can result in a duty. Here Medtronic actively works towards getting people to agree to get their device. They have the device implanted. They tell people if you have technical problems with this device, you call us. We can help you and we will help you with those technical problems. But even beyond that, there's nobody else to call. If you have a technical problem with the device, there's absolutely nobody else to call. I don't know if the district court or even Medtronic dispute at a high level the existence of some kind of duty of care here. I guess the question would be once we get into the issues of, well, how is that duty breached and what was the causation between this alleged breach and the injuries? Is that beyond the kind of common experience of a layperson that we would need to have expert testimony to help with the jury? I don't think so. First of all, that is more akin to a medical malpractice case or a legal malpractice case where you've got years of education and complex systems in place which dictate what those standards of care are. This is very, very simple. Medtronic's device was implanted into a person. It's a device that continues to work and function on a technological basis. Medtronic is the only entity that can address repairs to that. And it's reasonably foreseeable that something could go wrong with this electric – the electric components. How many of us had to learn what it meant to hard reset your phone or call IT because you had to reset the computer somehow because there's some computer glitch that caused it to not function correctly? That is reasonably foreseeable. The standard of care here was that they needed to show up. I don't think you need expert testimony to establish that there was a breach because they didn't show up. And Mr. Hunt over 100 hours was being shocked. The electrical impulses, he could not manipulate them with his own personal controller. So Hunt's claim is that the breach of the duty owed him was in failure to give him the tablet that he had been promised.  And gave him only a device which had three settings instead of 28. No. The failure to give him the tablet as promised is underneath the Consumer Protection Act. The damages as a result of the breach because the breach that we're alleging here is the failure to respond to him over those 100 hours asking Medtronic to come help. He went to – he called everybody he could, the Medtronic local reps, their boss, the headquarters in Minnesota, went to an ER to get a doctor. Didn't the Medtronic's people tell him that he had to go to a pain specialist, that is a doctor, to get the help? They did. That was their position at that time. But that position is contrary to any of their literature, which just says you need to be under the care of a doctor. He didn't lose because he failed the stated claim. I mean a lot of the arguments you're making are to the point that he has an alleged injury. He has a claim. I guess the concern the district court had is how are we going to try this in front of a jury with just kind of lawyer argument as opposed to people who know these devices and can speak to some of these more technical issues? But the technical issues don't go towards whether or not there was a breach of the duty of care. It is the context. It's not the same thing as if you have a medical malpractice case or the Fabrique case is a good example where in that case they went to some conference at the hotel and they ate there and they got salmonella. The plaintiff then ultimately started to suffer from arthritis. The question was whether or not the salmonella caused the arthritis. In that scenario with those obscure difficult technical medical facts, that's the causation. It required medical testimony. Here the causation, the damages we're talking about, those hundred hours of being shocked, which is the result of Medtronic failing to come help him. And do what? Failing to come and help him and do what? Turn the device off. That whether the device should be turned off or not is not a medical issue. I'm sorry, is not a medical issue about whether the device should be turned off or not. No, I think that if the device is causing him harm and he wants it turned off and he needs it turned off to stop the harm, then turning it off is the thing to do. You're presuming the harm. I mean, I was reading the expert testimony, which is a little unusual. It says, do you have any criticisms of my client Medtronic? No. And you don't have any criticisms of Medtronic's device representatives? True. And then they say no. And they just said the only thing I'm here for, that's the expert testifying, is just to tell you objectively where the leads are. And so going back to Judge Baez's question, the ultimate medical question here about turning it off or what should be done, there was no expert testimony as I understand it. But that's correct. And you're just saying you don't need it. That's correct. Okay. Because the damages are those hundred hours of being shocked, you don't need medical testimony about those hundred hours. I would draw the analogy of if somebody gets bitten by a dog, you don't need to have medical testimony to come in and say that the lacerations or the resulting scars are the result of the dog bite. A jury can make that determination based off of their observations and that testimony. In looking at the public interest aspect of it, the consumer protection aspect, I think it's important to note that this is alleged. Is it your position that Medtronic should have turned off this device without the advice of a pain specialist? Yes. But mind you, the patient has that ability to turn on and off the device on their own with their personal controller. It's not a medical decision. Why didn't he turn off the device himself? He tried. That was the problem. His personal controller was not manipulating the electronic pulses that were shocking him continuously. And it was not turning it off. It was so bad that he at one point tried to cut out the battery pack himself. And then to get it to stop, he took a mallet and beat it to make it stop. Call a pain specialist. He didn't go to the ER. He did go to the ER. But you're now claiming that Medtronic is responsible. So Medtronic, yes. Medtronic is responsible for not coming down and helping him. They had a duty to help him. They're the only ones that could. He did go to the ER. He asked that ER doctor to call Medtronic. Medtronic said no. He went to his primary care to call. Primary care did. Medtronic said no. They did at that point say you need to be under care of a pain management. But they've never in any of their documentation required just that you're under the care of a doctor. In addition, they had gone to that exact primary care's office clinic before and adjusted his spinal cord stimulator device. And, in fact, they marketed their device at that clinic, and there were several doctors at that clinic that prescribed those devices. I mean, this is getting technical here about who bears responsibility exactly for what. We have a medical device manufacturer that's doing some amount of servicing. We have a whole bunch of doctors involved. Why wouldn't we need an expert to come in and help a jury understand who does what? Because your argument sort of assumes that the scope of Medtronic's obligation was to do all of these things. And somebody could say, well, look, really this is more of a medical question. But it's not all these things. It was showing up to assist to change the electrical impulses on that device or turn it off, which they affirmatively represented that is their role. I don't think that there's a lot of technical aspects of how it works or when it works that's necessary to understand that that's the role that they said they had, and they refused to come down in this instance. I guess why wouldn't you want an expert to help the case? I mean, even if one's not strictly necessary, you had other experts here, but they then weren't taking a position on Medtronic, which is a little unusual. Yeah, well, what I can tell you is that most clinics have some relationship with Medtronic, and I've got about three minutes left. Okay, we'll put four minutes back for you. Okay, thank you. I appreciate it. Good morning. Good morning. Thank you, Judge Bress, and may it please the Court. David Suska for Medtronic USA. The District Court correctly granted summary judgment for Medtronic on each of Hunt's claims. Nothing in Mr. Hunt's appellate briefing and nothing that the Court has heard today could support disturbing the judgment below. Now, most of the panelists colloquy with Mr. Freeman focused on the negligence claim, so I think maybe I will start there. Your Honor, this is not a dog bite case. This case involves a spinal cord stimulator that is implanted in someone's body with leads that are placed in the epidural space. Further, this case involves a plaintiff who has a history of diagnosed disc degeneration, an inherited connective tissue disorder that has caused him chronic pain since adolescence, three prior spinal surgeries. It is plainly beyond the capacity of a lay juror using his or her ordinary senses to perceive what caused the pain, the 100 hours of pain that Mr. Freeman refers to earlier today in March of 2021. I think necessarily then, under Washington law, expert testimony was needed to assist lay jurors in making the determination as to breach and causation. And just focusing specifically on causation, again, if Mr. Hunt's position is he didn't need expert testimony, well, again, he didn't dispute that below. He went out and he sought expert testimony. And what his expert said is what we can tell you conclusively is that the leads moved several meters in Mr. Hunt's epidural space. As to the testimony of the experts that Judge McKeown read, were those experts deposed by you or by the plaintiff? I believe that the testimony that appears in the record excerpts is Medtronic's counsel's deposition of Hunt's disclosed experts. Dr. Badger testified that, you know, what I would say if called to testify at trial, I wouldn't offer any opinion as to what Medtronic did or did not do and whether it was appropriate or inappropriate. All I would say is the leads clearly moved, as a result of the car accident, several millimeters within the epidural space, which Dr. Badger explained is a very, I think he used the term, confined or restricted canal that runs essentially from the bottom of the skull to the top of the tailbone that's full of nerve endings. And as Dr. Badger explained, it doesn't take much movement of leads within that tiny space with all of those nerve roots to cause the kind of symptoms, physical symptoms that Mr. Hunt was complaining of and to potentially even cause nerve damage. And so again, this is not a dog bite case. This is a case that involves someone with a complicated medical history, a complicated medical device that's been implanted in his spine, a car accident that caused the leads in the epidural space to move. It is plainly beyond the capacity of lay jurors to assess, just take causation, right? There's a lot of talk in the case about duty and breach, a lot of talk today about duty and breach. Just focus on causation, which was one of the grounds for the judgment below. So you're saying that there's no evidence that the pain was caused by the device itself rather than the results of the accident? Is that what you're saying? Well, I take our burden on summary judgment, right? I accept it. You can draw favorable inferences in the record in Mr. Hunt's favor. Mr. Hunt says it's the device causing the pain. But I think the point that the district court correctly reached reading Washington law. And why is his opinion relevant? I think that's exactly that's where I was just exactly where I was going, Judge Bea. The district judge said even so, as a matter of Washington law, this is the kind of case that requires expert assistance to assist the lay juror to understand what could have caused the pain and further whether there was a breach of any assumed duty. And Mr. Hunt, again, he did not dispute below that he needed expert evidence on breach and causation. And he went out and he tried to get it. His expert testimony then undermined his case. It's not, though, that the expert testimony sort of vanishes from the record. It's still on the record. And I think it speaks to what his experts think is most likely the cause of the 100 hours of pain that he was suffering that he seeks to recover for in negligence. Again, in any case, the dispositive point is he needed expert evidence that supported him on the breaching causation elements and he did not adduce it. Yeah, I take it. I mean, he kind of wants to stylize the claim a little bit and say this device was causing me 100 hours of pain. I asked for it to be turned off. They had an obligation to do that because they said they would. Then they didn't do that. And that's just kind of you saying this isn't rocket science. Yeah, it's not rocket science. I wasn't able to push the button and turn it off. Well, I think two things, Your Honor. First, I think the theory of negligence has sort of evolved a bit and it's sort of evolved, I think, to meet different objections, including the sort of objection that the district court landed on, which is, well, if this is about what caused the 100 hours of pain, you need expert evidence on that. So then the negligence theory shifts a little bit to be about, well, I was told that I would get sort of reprogramming support whenever I needed it, and they didn't deliver on that, and that's not rocket science. I think it is still more complicated than that because, again, the question is could a lay juror decide that a Medtronic representative showing up either in the days before Mr. Hunt presents to the ER or at the ER would have just, again, focusing on causation, would have alleviated any of his discomfort? Again, the record is unambiguous. It's not disputed. The leads moved within his epidural space. Would a Medtronic representative coming and assisting Mr. Hunt as he demanded without the oversight of a qualified physician have alleviated that pain, have made it worse? It might not be rocket science, but this is sort of medical questions that go beyond the capacity of lay jurors to perceive with their senses. Pivoting from the negligence claim to the Consumer Protection Act claim, unless there are any other questions on negligence. I think the district court correctly concluded on the Consumer Protection Act claim that there was, to quote the district court, no evidence in the record, no evidence in the record that would support a reasonable inference that Medtronic was misleading sort of the public at large about the kind of programmer patients would receive. That is what's required to state a claim to prevail on a claim under the Consumer Protection Act. The statute disclaims that it shall not be construed to forbid practices that are not injurious to the public, as opposed to to the private plaintiff. That is what sort of imbues the case with the public interest that brings it within the scope of this statute, which opens up sort of like a private attorney general statute, you know, a panoply of extra remedies, attorney's fees, things like that. But there's nothing in the record, nothing, except Mr. Hunt's conjecture that supports even an inference that other patients were misled in the same way. Mr. Hunt's entire case on the Consumer Protection Act claim comes down to this. I was harmed in this way, or I say I was, and so it's reasonable to infer that others were as well. Didn't he take a deposition of Medtronic's salesman? Yes. And didn't he ask him what the regular custom and practice of Medtronic's was in dealing with the patients of buyers? There were many questions put to the representatives, both Mr. Kilpatrick and Mr. Peterson, about the sort of conversations that the representatives have with patients during the trial process and then after the implant. And is there any evidence that that conversation would be repeated to other members of the public? So Mr. Kilpatrick testified as to what kind of conversations he typically has with patients who are going to undergo a trial for an implant. Did he ask whether that was a custom and practice of his company? He did not speak to standardized practices, scripts, anything like that. There are repeated assertions in Mr. Hunt's opening and reply briefs that Medtronic's representatives use standardized presentation scripts. That is just totally unsubstantiated. We pointed this out, of course, in our answering brief. We said there's lots of assertions about standardized presentations. For one thing, Mr. Hunt doesn't need evidence of standardized presentations. He needs evidence of standardized misrepresentations. But for another, there is no record evidence of standardized presentations or scripts. Mr. Hunt then comes back on reply and says, well, here are my record sites. He provides four record sites. These are on page 10 of his reply brief. One of them is Mr. Kilpatrick testifying at his deposition. I don't remember the specifics of any discussions that I had with Mr. Hunt all those years ago, except that I met him there. And the only thing I remember is meeting William Hunt. I don't remember what was discussed. Two of the record sites are Mr. Kilpatrick, again, the Medtronic representative, describing the kind of conversations he usually has with patients who are going to undergo a trial. He says, I tell them sort of what kind of what the feeling, the sensation will be. I tell them how they can turn it on and off, how to charge it. That's it. There's nothing about, you know, Medtronic representatives are instructed to tell patients X, Y, or Z. Nothing like that. And the fourth citation that appears on page 10 of the reply brief that, again, is in support of the assertion that they're standardized representations, is Mr. Kilpatrick again saying, you know, I remember meeting Mr. Hunt. I can't tell you exactly when it was. It probably would have been when he had his trial. I don't remember anything more specific than that. Those are the assertions in Mr. Hunt's brief about standardized representations. And, again, even if the court is to construe those sort of in the light most favorable to Mr. Hunt and say, well, if that's sort of how Mr. Kilpatrick says he usually talks to patients, maybe other people do too, none of that goes to whether there are standardized misrepresentations about the programmer patients will receive. And against the sort of bare record that Mr. Hunt developed on that, the district court observed Medtronic put in unrebutted evidence that it has never allowed patients to use or to take home the clinician programmer and that the conditions of FDA's approval of the device would not allow that. On that record, it is simply implausible. It's unreasonable, I should say. It would require sort of several leaps of inferences to get to Medtronic as misleading the public at large in a way that would support a Consumer Protection Act claim. Now, I'll spend, if there are no questions on the Consumer Protection Act claim, I'll spend just a minute on the first argument in our brief. I do think that the court could appropriately strike Mr. Hunt's brief and dismiss the appeal. That's a pretty extreme remedy, so I'll speak for myself. I don't think that would be justified here. I completely— Don't lose your time on that. I understand. I will take the court's direction. If the court has no further questions, then, on either negligence or the Consumer Protection Act claim, we'll rest on our submissions. Thank you very much, Mr. Suska. Thank you. Okay, Mr. Freeman, rebuttal. Thank you. A couple of responses to some of the representations that were just made. The comment that under Washington law, it's clear that experts are required to define the duty and breach the duty here, that's really the point. There are no Washington cases at all that substantiate that finding. In fact, the trial court had to go to a case out of Texas to find any citation that supports that determination. But that case was materially different. It involved a negligent misrepresentation of a device in a marketing scheme. And, of course, in that scenario, you would need to know what the capabilities and functions of a device are versus what was represented to make that determination. This would be the first time any Washington case has found that outside of a medical malpractice or legal malpractice scenario, there's expert testimony required to either define a duty or to establish a breach of that duty. And there's a reason for that, and what we're talking about is ordinary care. Our theories of negligence on this case have not evolved over the course of the case. From the very first complaint that was filed in the Superior Court in Pierce County, the theory on negligence was one of ordinary care. Well, that's a broad description of negligence as a general matter, but what is this theory of negligence that Medtronic should have after the device allegedly malfunctioned should have done something? Is that specifically the theory? That's correct. That is specifically what it is. And there's a lot of conversation about his medical history and this accident where the leads moved as being potentially causation. But perhaps the leads moving is what was a proximate cause to what he felt. But that was 13 months, 14 months prior to the issue in March of 2021. It wasn't like we got in an accident and then two days later he's having these problems. There's well more than a year that's gone by. But your causation argument assumes that it was the device that was causing the pain rather than the results of the accident. So, well, we can point to that 14 or 15 months also. But I think that Mr. Hunt can certainly testify to what he's feeling inside his body and that he knows what these electric shocks are and that he knows that that's where they're coming from, the electric shocks. And then once he beats the device into submission, they stop. So – and by the way, there can be more than one proximate cause to a thing. But for the accident, would this have ever happened? Very well may be. But that's not the issue. The issue is whether or not Medtronic, who's got the sole ability to come in and try to help him either manipulate the electrical impulses or shut the device down in totality. They're the only ones that can do it. It would be like in your office. The only person that can come in is your IT guy and that's his job and he doesn't. You're going to say he did something wrong. And how do you face the testimony that Judge McKeown has read that your own experts said Medtronic did nothing wrong? So – but you've got to go back and look at what the purpose of the experts were. Those experts weren't asked the question by us. That's not the purpose that they were there. They were there to be able to explain Mr. Hunt's very complicated medical history. That's what they were there for. They were never asked the question of do you think Medtronic did something wrong? That wasn't their role in this case. They were asked that. They were asked that not by us. That's not what they were retained for. They were asked that. Well, what they said is, nope, that's not in the purview of our expert testimony, period. Right. But so they – we didn't have any expert testimony on causation. Is that true? Because I don't believe that we needed it. I understand that you don't need it but there is none. There is none. Okay. Right. Thank you. That is true. I am now over time, so thank you. I appreciate your time this morning. Mr. Freeman, thank you. Thank you. Mr. Seska, thank you. This case is submitted.
judges: McKEOWN, BEA, BRESS